# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2025-NMCA-002**

**Filing Date: October 30, 2024**

**No. A-1-CA-41172**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**PAUL SANDOVAL,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Stan Whitaker, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Van Snow, Acting Deputy Assistant Solicitor General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Mallory E. Harwood, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**HANISEE, Judge.**

**{1}** Defendant Paul Sandoval appeals his convictions of numerous offenses against the victim in this case, a minor named S.M. (Victim), including four counts of criminal sexual penetration (CSP), contrary to NMSA 1978, Section 30-9-11(D), (E) (2009); five counts of criminal sexual contact of a minor (CSCM), contrary to NMSA 1978, Section 30-9-13 (2003); and one count each of child abuse and giving alcoholic beverages to a minor, contrary to NMSA 1978, Section 30-6-1(D)(1) (2009) and NMSA 1978, Section 60-7B-1(A) (2013), respectively. On appeal, Defendant claims that prosecution for five of his convictions, each being either a third- or fourth-degree felony, was barred by the

relevant statute of limitations, which requires indictment to be found within five years of the alleged crimes. *See* NMSA 1978, § 30-1-8(B) (2009, amended 2022).[1] Defendant further argues that all but two of his remaining convictions, four counts of which were presented to the jury as alternatives to the primary count, violate his constitutional protections against being twice placed in jeopardy for the same offense. *See* N.M. Const. art. II, § 15; U.S. Const. amend. V. Lastly, Defendant alleges that certain errors in jury selection and instruction constitute reversible error. For the reasons set forth below, we affirm in part, reverse in part, and remand for resentencing in accordance with this opinion.

## BACKGROUND

**{2}** On April 25, 2014, Victim, then a fifteen-year-old girl, received a text message from Defendant at some point during the night inviting her to "hang out." At that time, Victim was already acquainted with Defendant, then a nineteen-year-old male, the two having previously engaged in consensual sexual intercourse at least once. Victim accepted Defendant's invitation to hang out, and soon thereafter Defendant and another male, Stacy Walker, arrived at Victim's house in a vehicle to pick her up. Defendant and Walker, both of whom appeared to be intoxicated, then drove Victim to Defendant's residence.

**{3}** Once at Defendant's home, Victim noted that it looked as though a party had just ended, observing alcohol "everywhere" within the house and a table set up for drinking games. No one else was present in the home aside from Victim, Defendant, and Walker. Once the three arrived, Defendant and Walker continued to drink beer. Victim was initially reluctant to consume alcohol, but the two men backed her into a corner of the living room and told her she had to drink. Victim became scared and drank a cup of beer in an effort to get the men away from her. Victim then felt sick and went to the bathroom where she vomited. Upon returning from the bathroom, one of the men—which one is unknown—threw Victim over Walker's lap and Defendant started to spank her buttocks through her pants. Victim told Defendant and Walker to stop, but Defendant continued to hit her. Victim asked to be released so she could lay down, and Defendant instructed her to go to his bedroom, which she did. Walker and Defendant then followed Victim into Defendant's bedroom, and Defendant locked the door behind him.

**{4}** Inside the bedroom, Defendant grabbed Victim from behind while she was facing Walker, who was seated on the bed in front of her. Defendant and Walker then took Victim's clothes off as well as their own while Victim asked them to stop. They did not. Defendant and Walker then proceeded to sexually assault Victim by penetrating her both vaginally and anally. Victim repeatedly told the men to stop, and Defendant responded by hitting Victim in the face while berating her. Also while committing the assault, Defendant touched Victim's vagina with his fingers and bit Victim's breasts with

---

[1]Section 30-1-8 has been amended since the crimes in this case occurred, but the amendment does not affect the portion of the statute relevant to this opinion. Thus, we cite the current version of the statute throughout this opinion.

his mouth. After an unidentified amount of time, Victim persuaded Defendant and Walker to stop by asking them for "a break." The men stopped, and Victim, noticing they were distracted, put on her pants, grabbed some of her remaining belongings, and ran out of the bedroom. Defendant and Walker chased Victim as she exited the house, but after a brief altercation in which Victim hit Defendant to escape his grasp, Victim was picked up by her grandmother at a nearby gas station.

{5}     Victim declined her grandmother's suggestion to go directly to the hospital, but underwent a sexual assault nurse examination (SANE) the next day, on April 26, 2014. Police officers also went to Victim's house on that day, apparently in response to a call from a family member, but Victim refused to cooperate. Victim subsequently spoke to an officer about the incident on May 13, 2014, but stated that she "did not want to go forward" and the officer closed the case until further leads could be developed. Victim ultimately reported the incident in full to law enforcement on June 11, 2014. As a result of this report and the ensuing investigation, Defendant was initially indicted for his role in the assault on May 15, 2017. Nearly fifteen months later, that case was dismissed via nolle prosequi filed by the prosecution, which stated that "additional investigation and scientific testing [was] needed." The subsequent indictment underlying the instant case was filed on November 26, 2019, just over five years and seven months after the above-described offenses.

{6}     In the present indictment, Defendant is charged with eight offenses, five of which contain charges "in the alternative" to the primary count. In general terms, Count 1 of the indictment charges Defendant with the following: criminal sexual penetration of Victim's vagina, either through the use of force or coercion and when aided and abetted by another, or, alternatively, criminal sexual penetration of a minor through the use of force or coercion. *See* § 30-9-11(D), (E)(1). Count 2 of the indictment alleges criminal sexual penetration of Victim's anus in the same manner and contains the same alternate charge. *See id.* Counts 3 and 4 charge Defendant with criminal sexual contact of a minor, while helped or encouraged by another, for touching Victim's unclothed genitals and breasts, collectively. *See* § 30-9-13(B)(2)(c). The alternative charge in each count alleges the same conduct but without the aid of another and does not specify that Victim was unclothed. *See* § 30-9-13(D)(1).

{7}     Count 5 alleges a further instance of criminal sexual contact of a minor for spanking Victim's clothed buttocks with the help or encouragement of another.[2] *See* § 30-9-13(C)(2)(c). The alternative charge in Count 5 alleges the same but does not mention other persons. *See* § 30-9-13(D)(1). Count 6 charges Defendant with child abuse for striking Victim in the face, contrary to Section 30-6-1(D), and does not contain an alternate charge. Count 7 was dismissed by the district court, and Count 8 charges

---

2Count 5 in the indictment originally charged Defendant with criminal sexual contact of a minor for spanking Victim's *unclothed* buttocks, a second-degree felony. *See* § 30-9-13(B)(2)(c). However, this charge was amended down to a third-degree felony at trial, because the evidence revealed that Defendant spanked Victim through her pants. *See* § 30-9-13(C)(2)(c). Defendant did not object to this amendment, stating that given the change, he would not move for directed verdict on that charge.

Defendant with giving alcohol to a minor, Victim, contrary to Section 60-7B-1(A). Count 8 does not contain an alternate charge.

**{8}** After trial, and despite being instructed that Defendant could only be convicted of the primary charge *or* its alternate, the jury convicted Defendant of all the above charges, including the alternates, except the alternate charge in Count 4. The district court subsequently sentenced Defendant for all of the above convictions to a prison term of thirty years, followed by ten years of probation and an indeterminate period of parole. Notably, the district court treated the primary charge in Count 5 as a second-degree felony and sentenced Defendant accordingly despite its stipulated reduction to a third-degree felony at trial. Defendant appeals the judgment and his subsequent sentencing, raising the arguments identified above. We address each in turn.

## DISCUSSION

### I. Statutes of Limitations

**{9}** Defendant first argues that his convictions of five separate third- and fourth-degree felonies—Counts 3 (alternative), 5, 5 (alternative), 6, and 8—violate the statute of limitations barring prosecution for such offenses. *See* § 30-1-8(B) (requiring indictment to be found, or information or complaint to be filed, within "five years from the time the crime was committed" for third- and fourth-degree felonies). Defendant asserts that the second indictment was filed beyond the five-year time frame and that, although argument regarding the statute of limitations was not raised below, such is not a bar to raising this defense on appeal. Defendant further contends that no statute permitting tolling of the statute of limitations applies to this case, and Defendant's relevant convictions must, therefore, be reversed. We agree and vacate his third- and fourth-degree felony convictions.

**{10}** "When facts relevant to a statute of limitations issue are not in dispute, the standard of review is whether the district court correctly applied the law to the undisputed facts." *State v. Kerby*, 2007-NMSC-014, ¶ 11, 141 N.M. 413, 156 P.3d 704 (internal quotation marks and citation omitted). "We review questions of law de novo." *Id.* Defendant and the State agree for the purposes of this argument that Victim's interview with police on June 11, 2014, constitutes a "report" to law enforcement and began the limitation period of five years for prosecution of third- and fourth-degree felonies. *See* NMSA 1978, § 30-1-9.1 (1987) (tolling the limitation in Section 30-1-8(B) "until the victim attains the age of eighteen or the violation is reported to a law enforcement agency, whichever occurs first"). Thus, no question of fact regarding the applicability of the statute of limitations is present, and our review is de novo.

**{11}** Defendant's argument requires us to determine whether the Legislature intended to abrogate nonstatutory tolling of a statute of limitations. This question presents an issue of statutory interpretation, which we consider de novo. *See State v. Duhon*, 2005-NMCA-120, ¶ 10, 138 N.M. 466, 122 P.3d 50. "Our primary goal when interpreting statutory language is to give effect to the intent of the [L]egislature." *State v. Torres*,

2006-NMCA-106, ¶ 8, 140 N.M. 230, 141 P.3d 1284. "We do this by giving effect to the plain meaning of the words of statute, unless this leads to an absurd or unreasonable result." *State v. Marshall*, 2004-NMCA-104, ¶ 7, 136 N.M. 240, 96 P.3d 801.

**{12}**   Defendant argues, and the State concedes, that the primary tolling statute, NMSA 1978, Section 30-1-9 (1963) (providing enumerated circumstances that toll application of Section 30-1-8) does not apply to this case. Indeed, the State does not argue that any statutory tolling provision applies to the circumstances present here. Rather, the State exclusively relies on a theory of nonstatutory tolling to contend that the five-year limitation period in Section 30-1-8(B) was paused during the pendency of the first indictment in this case. According to the State, the limitation period ran from June 11, 2014—when Victim fully reported the crime to police—to May 15, 2017—when the first indictment was filed—but was then tolled until the State filed its nolle prosequi on August 2, 2018. Under this theory, the State incorporates an additional fourteen months and eighteen days, the amount of time the first indictment was pending, into the five-year prescriptive window in which Defendant must otherwise have been indicted.

**{13}**   In so arguing, the State relies on *State v. Martinez*, 1978-NMCA-095, 92 N.M. 291, 587 P.2d 438, to assert that nonstatutory tolling, sometimes called common law tolling, is a valid practice in New Mexico criminal cases. In *Martinez*, the defendant committed the underlying offense on August 7, 1974. *Id.* ¶ 5. A three-year statute of limitation applied to prosecutions arising from that offense, and the defendant was charged by criminal complaint, filed in magistrate court, on August 5, 1977, two days before the limitation period expired. *Id.* ¶¶ 2-5. Twenty days later, the state filed a felony indictment for the same offense in district court, voluntarily dismissed the complaint in magistrate court, and thereafter proceeded to trial for the felony. *Id.* ¶¶ 2, 9.[3] The defendant was later convicted by a jury, but the district court vacated the jury's verdict and dismissed the case because the indictment violated the statute of limitations. *Id.* ¶ 2.

**{14}**   On appeal, this Court reversed the district court's order, stating that "the indictment was timely because the limitation period was tolled by the filing of the complaint." *Id.* ¶¶ 12, 25. Our holding rested on the fact that the initial complaint was timely filed in magistrate court, which then had limited jurisdiction to conduct a preliminary hearing and determine if probable cause existed to bind the defendant over for felony trial in district court. *See id.* ¶ 6. We noted that if probable cause was so found, the proceedings in district court must then have proceeded "either on the basis of indictment or information," *id.* ¶ 7, and the initiating complaint filed in magistrate court would then have been superseded, *see id.* ¶¶ 9, 18.

**{15}**   Our holding in *Martinez*, therefore, rests on the operation of criminal procedure: the state filed a complaint in magistrate court alleging felony charges against the defendant; the state then opted to have the grand jury, rather than the magistrate,

---

[3]The indictment may have been filed on August 27, 1977, but it is unclear which date is correct. *See id*. ¶ 8 (stating the indictment was filed on the later date). In either case, the indictment was filed outside of the limitation period, which ended on August 7, 1977. *See id*. ¶¶ 2-5.

determine whether probable cause existed to support a felony indictment; and once that determination was made, the state issued a superseding felony indictment in district court, and the magistrate court was without jurisdiction to hear the felony charges. *Id.* ¶¶ 2, 6-9. Most importantly, there was no lapse between the criminal complaint, which was timely filed in magistrate court, and the subsequent proceedings in district court. *See id.* ¶¶ 5, 10. Thus, as indicated by the *Martinez* Court's consideration of the word "continuation" as a valid view in relation to "tolling," the statute of limitations in that case was never violated, and no tolling provision, statutory or otherwise, was required to allow for further prosecution. *See id.* ¶ 10.

**{16}** In other words, *Martinez* merely recognizes various facets of criminal procedure related to the progression of a single case from magistrate to district court and the fact that, if the magistrate had determined probable cause existed, a new charging instrument must have nonetheless been filed in district court just as it had been, and such a procedural requirement should not operate as a bar to prosecution. Indeed, as we repeatedly stated, our holding applies to "the circumstances of th[at] case." *Id.* ¶¶ 8, 24.

**{17}** The State points us to two additional cases in its argument that the first indictment here tolled the statute of limitations while it was pending. First, it cites *State v. Collier*, in which the defendant was timely charged with felony extreme cruelty to animals, but not its lesser included misdemeanor offense, within seven months of the alleged crime. 2013-NMSC-015, ¶ 4, 301 P.3d 370. The first proceeding resulted in a mistrial due to jury deadlock, and, at the second trial in January 2009, the state requested, for the first time, that the jury be instructed on the lesser included misdemeanor. *Id.* ¶¶ 5-6. The second trial resulted in acquittal on the felony charge, but the jury hung on the misdemeanor. *Id.* Thereafter, the district court dismissed the case, concluding the state did not "explicitly charge [the d]efendant with [the] misdemeanor . . . within the two-year statute of limitations period for that crime." *Id.* ¶ 7.

**{18}** On appeal, our Supreme Court held that the case should not have been dismissed because the state filed its felony indictment "within the limitations period" for both the felony and its lesser included misdemeanor. *See id.* ¶ 31. The Supreme Court further stated, "A timely filed charging document stops the statute of limitations clock from running on any explicitly charged offenses and any lesser included offenses upon which the district court properly instructs the jury at trial." *Id.* ¶ 37. Thus, as in *Martinez*, tolling of the statute of limitations was never required to maintain a prosecution because the initial charging document was timely filed, and no lapse between it and a subsequent one ever occurred. *See Collier*, 2013-NMSC-015, ¶ 37.

**{19}** The third case the State references is *State v. Padilla*, 2023-NMCA-047, 534 P.3d 223, *cert. granted* (S-1-SC-39897, July 10, 2023). In *Padilla*, this Court recently considered whether a timely filed criminal complaint, later dismissed for improper venue, permitted the untimely filing of a subsequent indictment. *Id.* ¶ 1. We held that (1) the defendant's motion to dismiss for improper venue "fell within the category of circumstances governed by [the statute]," but (2) Section 30-1-9(B) did not toll the

limitation period "because the [i]ndictment was not brought within five years of the last charged event." *Padilla*, 2023-NMCA-047, ¶¶ 8, 10; *see also* § 30-1-9(B)(4) (requiring that, regardless of applicable tolling provisions, a subsequent indictment, information, or complaint must be "brought within five years from the date of the alleged commission of the original crime"). In other words, we held that the limitation period at issue *could have* been tolled under Section 30-1-9(B)(3) if the state had complied with the five-year outer-limit contained in Section 30-1-9(B)(4), but it did not. *Padilla*, 2023-NMCA-047, ¶¶ 8, 10.

**{20}** Our holding in *Padilla* was narrow: while we noted that we do not read *Martinez*, discussed above, to permit nonstatutory tolling "when . . . Section 30-1-9(B) applies to the circumstances of the case," we also stated that "we make no determination about the application of nonstatutory tolling" in other circumstances. *Padilla*, 2023-NMCA-047, ¶¶ 12, 13. The State now argues that *Padilla*'s limited holding does not establish the broader proposition that nonstatutory tolling is unavailable in New Mexico criminal cases. The State contends that since both it and Defendant agree Section 30-1-9 does not apply to this case, this Court should recognize what the State views to be the implicit holdings of *Martinez* and *Collier*: that nonstatutory tolling is a permissible practice in New Mexico under certain circumstances, and that the limitation period in this case regarding third- and fourth-degree felonies was tolled while the first indictment was pending. We disagree and now hold that which *Padilla* left unresolved: when statutory tolling provisions do not apply to the circumstances of the particular case, the Legislature did not intend for nonstatutory tolling to nevertheless extend a statute of limitations. As such, we disagree with the State and conclude Defendant's affected convictions must be vacated.

**{21}** The precise question presented by this case is whether the existence of Section 30-1-9 indicates a legislative intent to exclude other forms of tolling not contained therein, or whether its narrow language and applicability impliedly permits nonstatutory tolling, as the State here argues it does. This presents a question of statutory interpretation, which first requires us to turn to the plain language of the statute itself. *See State v. Vest*, 2021-NMSC-020, ¶ 14, 488 P.3d 626 ("[Our] primary goal when interpreting statutes is to further legislative intent." (internal quotation marks and citation omitted)). Although this is our first guide to the Legislature's purpose in enacting a statute, "we must take care to avoid adoption of a construction that would render the statute's application absurd or unreasonable or lead to injustice or contradiction." *State v. Strauch*, 2015-NMSC-009, ¶ 13, 345 P.3d 317. "We therefore must examine the plain language of the statute as well as the context in which it was promulgated, including the history of the statute and the object and purpose the Legislature sought to accomplish." *Id.* ¶ 14 (internal quotation marks and citation omitted).

**{22}** Section 30-1-9(B), the portion of the tolling statute relevant to this case, tolls the limitation period for commencing prosecution when

(1)    an indictment, information or complaint is lost, mislaid or destroyed;

(2)     the judgment is arrested;

(3)     the indictment, information or complaint is quashed, for any defect or reason; or

(4)     the prosecution is dismissed because of variance between the allegations of the indictment, information or complaint and the evidence; and a new indictment, information or complaint is thereafter presented, the time elapsing between the preferring[4] of the first indictment, information or complaint and the subsequent indictment, information or complaint shall not be included in computing the period limited for the prosecution of the crime last charged; provided that the crime last charged is based upon and grows out of the same transaction upon which the original indictment, information or complaint was founded, and the subsequent indictment, information or complaint is brought within five years from the date of the alleged commission of the original crime.

Notably, Section 30-1-9(B) does not provide for tolling in cases where, as here, the state voluntarily dismisses its own charges. *See Martinez*, 1978-NMCA-095, ¶ 16 (stating that the Legislature did not intend the statute to apply to voluntary dismissals). Neither party disputes this proposition. Nonetheless, whether this statute serves as well to eliminate application of nonstatutory tolling is determined by its language and history and is a question we are, unlike in *Padilla*, now required to answer.

**{23}**     As indicated by the majority opinion and dissent in *Padilla*, the language of Section 30-1-9 does not lend itself to any clear conclusion of legislative intent regarding the applicability or abrogation of common law tolling principles. *Compare Padilla*, 2023-NMCA-047, ¶ 12 (holding that nonstatutory tolling does not apply when a case falls within the circumstances described in Section 30-1-9 but stopping short of commenting on whether it may be applicable in other circumstances), *with Padilla*, 2023-NMCA-047, ¶ 18 (Duffy, J., dissenting) (proposing affirmance by stating that *Martinez* opened the door to nonstatutory tolling and that Section 30-1-9 did not establish limitation of other tolling mechanisms outside of the statute). Indeed, as we have stated, we did not decide in *Padilla* whether nonstatutory tolling may be applied in circumstances where Section 30-1-9 is inapplicable. *Padilla*, 2023-NMCA-047, ¶ 13. Nonetheless, we remarked that the statute's long history absent any amendment since 1963, coupled with the Legislature's adoption of several other, more specific tolling statutes, implies that the Legislature intended for the statute to apply generally to criminal offenses and evinces "the Legislature's intent to permit tolling under limited circumstances." *Id.* ¶ 14; *see also* § 30-1-9.1 (enacting a tolling statute for specific offenses against children); NMSA 1978, § 30-1-9.2 (2003) (permitting tolling for crimes involving criminal sexual penetration when DNA evidence exists but no suspect has been identified).

---

[4]The term "preferral" means, "[t]he act of putting forward or bringing forth criminal charges against a person." *Preferral, Blacks Law Dictionary* (12th ed. 2024).

**{24}** We adhere to this analysis and, to the extent *Padilla* left unresolved this question for another day, that day has arrived. We now hold that the Legislature has established the circumstances in which criminal statutes in New Mexico may be tolled and has thereby disallowed application of separate, nonstatutory tolling. As discussed below, *Martinez* and *Collier* present no barrier to this conclusion because neither case involved a circumstance in which the statute of limitations was tolled and then restarted. *See Martinez*, 1978-NMCA-095, ¶ 10; *Collier*, 2013-NMSC-015, ¶ 37. We are thus without any established precedent indicating that nonstatutory tolling has been recognized in New Mexico, and decline to adopt it here.

**{25}** In our view, the public policy underpinning statutes of limitations further supports this conclusion. *See State v. Kerby*, 2007-NMSC-014, ¶ 13, 141 N.M. 413, 156 P.3d 704 (stating that the purpose of criminal statutes of limitation "is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions" (internal quotation marks and citation omitted)). Under the State's argument in this case, a timely filed charging document that is later voluntarily dismissed—and therefore outside the purview of Section 30-1-9, *see Martinez*, 1978-NMCA-095, ¶ 16 (stating that the Legislature did not intend the statute to apply to voluntary dismissals)—would toll the statute of limitations and allow the state to, if it so chose, repeatedly file and dismiss charges—pausing and unpausing the running of the limitation period—against a defendant well beyond the limitation announced in Section 30-1-8. To enable such a stratagem would serve to undermine the very purpose of statutes of limitations themselves and render all but meaningless the apparent purpose of Section 30-1-9, which established tolling in only limited and enumerated circumstances.

**{26}** Stated differently, to hold as the State suggests would empower it to orchestrate its own limitation period in any given case, undermining legislative autonomy and rendering indefinite the period of time in which an uncharged citizen must await prosecutive determination of whether the power of the state will or will not be employed against such an individual. Indeed, the legislative purpose underpinning statutes of limitations is to restrict the State's ability to unduly delay criminal prosecution and to prevent citizens from laboring under threat thereof for indefinite periods. *See State v. Morales*, 2010-NMSC-026, ¶ 13, 148 N.M. 305, 236 P.3d 24 (stating that the purpose of statutes of limitations "is to limit exposure to criminal prosecution to a certain fixed period of time" (internal quotation marks and citation omitted)). A contrary holding, to us, is not what lawmakers intended by enacting either Sections 30-1-8 or -9, nor a reasonable interpretation of applicable precedent.

**{27}** *Martinez* and *Collier* do not require a different rule or acknowledgement of a limited exception. Those cases pertain to facts in which a timely complaint or indictment was filed, but the convictions ultimately obtained at trial were based on either a superseding charging document as required by criminal procedure or allegations not expressly charged but "necessarily" included lesser offenses associated with a timely charged felony crime. *See Martinez*, 1978-NMCA-095, ¶¶ 2, 9-12; *Collier*, 2013-NMSC-015, ¶¶ 4-7. In both cases, there was no lapse between the original charging document,

the subsequent one, and the conviction ultimately challenged. *Padilla*, although analyzing a lapse of merely two months between the initial and subsequent charging document, 2023-NMCA-047, ¶¶ 2-3, involved a circumstance in which Section 30-1-9 applied—dismissal due to improper venue—yet the subsequent charging document was not "brought within five years" from the commission of the alleged offense, as also required by the tolling statute. It is the latter failure which caused this Court to vacate the defendant's convictions. *Padilla*, 2023-NMCA-047, ¶¶ 10-12. In none of these cases did nonstatutory tolling, in the sense of a paused statute of limitations, apply to extend the statute of limitations.

{28}   The facts of this case are altogether different from the above cases and illustrate why broader acceptance of nonstatutory tolling is incompatible with Section 30-1-8 and therefore unwarranted. Here, the State voluntarily dismissed the first indictment against Defendant primarily because, although over four years had passed since Defendant committed the crimes in question, the State discovered that it had never tested Victim's clothing for scientific evidence. Despite this realization, the State still issued its subsequent indictment over fifteen months after it dismissed the first one. These choices represent strategic decisions by the State and constitute the type of delayed, prolonged possibility of prosecution that Section 30-1-8 is specifically designed to guard against.

{29}   Neither existing precedent nor statutory law permits tolling of the statute of limitations when the State voluntarily dismisses its own charges to obtain more evidence in support of its case. Here, the State filed its second indictment alleging third- and fourth-degree felonies against Defendant five years and seven months after he committed the alleged offenses, which is beyond the time permitted by Section 30-1-8(B). The State has provided us with no viable exception to the statute, jurisprudence, or our rationale as explained above, and Defendant's third- and fourth-degree felony convictions must, therefore, be vacated.

## II.   Defendant's Convictions of CSCM Violate Double Jeopardy

{30}   Defendant next argues that his two remaining convictions of CSCM—Counts 3 and 4 for touching Victim's unclothed vagina and breasts—violate double jeopardy because the underlying acts constitute conduct unitary with CSP (Counts 1 and 2). We agree and conclude that Defendant's convictions of Counts 3 and 4 must be vacated.

{31}   "Appellate review of a claim that multiple punishments have been imposed for the same offense in violation of the Fifth Amendment prohibition against double jeopardy presents a question of law which we review de novo." *State v. Sena*, 2020-NMSC-011, ¶ 43, 470 P.3d 227. "One of the protections of the Fifth Amendment is the prohibition of multiple punishments for the same offense." *Id.* ¶ 44 (internal quotation marks and citation omitted). Such duplicative punishment may arise either through charges alleging multiple violations of an individual statute for a single course of conduct or from instances "in which a defendant is charged with violating different statutes in a single course of conduct." *Id.* The latter of these, and the form of double jeopardy violation

Defendant argues is present here, is called "double[] description." *See id.* Appellate courts review double description claims in a two-part analysis. *See id.* ¶ 45. First, we must determine whether the conduct underlying each offense is unitary, i.e., conduct sufficiently indistinguishable such that the defendant may not be punished separately for each act committed. *See Swafford v. State*, 1991-NMSC-043, ¶¶ 25-26, 112 N.M. 3, 810 P.2d 1223.

**{32}** Only if the conduct at issue is unitary do we proceed to the second step in our analysis which asks whether the Legislature "intended to create separately punishable offenses." *Id.* ¶ 25. Here, however, both Defendant and the State agree that under the facts of the present case, the Legislature did not intend to separately punish unitary conduct underlying convictions for both CSP and CSCM. *See State v. Porter*, 2020-NMSC-020, ¶ 8, 476 P.3d 1201 (requiring comparison of the elements of the offense by "looking at the [s]tate's legal theory of how the statutes were violated"); *State v. Mora*, 2003-NMCA-072, ¶¶ 2, 19, 133 N.M. 746, 69 P.3d 256 (stating that based on the elements of the offense, the "[L]egislature has not clearly expressed an intention for multiple punishments for unitary conduct that violates [the CSP and CSCM statutes]"). Thus, the only question is whether Defendant's touching of Victim's breasts and vagina was unitary with his penetrative assaults.

**{33}** "A defendant's conduct is unitary if the acts are not separated by sufficient indicia of distinctness." *State v. Phillips*, 2024-NMSC-009, ¶ 38, 548 P.3d 51 (internal quotation marks and citation omitted). New Mexico appellate courts have provided general guidelines that aid our determination regarding whether specific acts are sufficiently distinct in the form of the six so-called "*Herron* factors": (1) temporal proximity of charged conduct, (2) location of the victim or victims during each act, (3) existence of any intervening events, (4) sequencing of criminal conduct, (5) the defendant's intent as evidenced by his conduct and utterances, and (6) the number of victims. *See Herron v. State*, 1991-NMSC-012, ¶ 15, 111 N.M. 357, 805 P.2d 624 (announcing the factors in a unit of prosecution, CSPM case); *State v. Bernal*, 2006-NMSC-050, ¶¶ 15-16, 140 N.M. 644, 146 P.3d 289 (listing the *Herron* factors and explaining that they are applicable in double description, "indicia of distinctness" analyses as well). We note that courts are not limited to consideration of these factors alone. *See Swafford*, 1991-NMSC-043, ¶ 28. Rather, they serve as general principles we may consider while the thrust of an "indicia of distinctness" analysis remains "determin[ing] whether the conduct for which there are multiple charges is discrete (unitary) or distinguishable." *See id.*

**{34}** Despite continued use of the *Herron* factors, albeit with varying emphases on different facts in each case, *see Bernal*, 2006-NMSC-050, ¶ 17, New Mexico appellate courts have identified several other guiding principles applicable when determining whether a defendant's conduct is unitary. *See, e.g., State v. Begaye*, 2023-NMSC-015, ¶ 14, 533 P.3d 1057 (identifying several cases in which the unitary analysis turns primarily on whether the conduct at issue was "sufficiently distinct as to time, place, or action"). If the acts in question cannot be separated by time and place, "resort must be had to the quality and nature of the acts or to the objects and results involved." *Swafford*, 1991-NMSC-043, ¶ 28. We may also look to the "elements of the charged

offenses, the facts presented at trial, and the instructions given to the jury." *Sena*, 2020-NMSC-011, ¶ 46. Another principle established by our case law provides that, "[u]nitary conduct is not present when one crime is completed before another is committed, or when the force used to commit a crime is separate from the force used to commit another crime." *Id.* Irrespective of which of the *Herron* factors or other considerations is deemed controlling in a given case, our case law makes clear that "if it reasonably can be said that the conduct is unitary, then we must conclude that the conduct was unitary." *Phillips*, 2024-NMSC-009, ¶ 38 (internal quotation marks and citation omitted).

**{35}** With the above principles in mind, we turn to the instant case. Defendant asserts that the acts underlying the two counts related to touching Victim's breast and vagina happened at the same time as the acts underlying the two counts related to separate penetrations. We observe that all of the conduct at issue, Defendant's penetration of both Victim's anus and vagina as well as his touching of her breasts and genitals, occurred in Defendant's bedroom without any identifiable temporal breaks in the overall assault. Defendant and Walker maneuvered Victim into different positions several times throughout the event, during which Defendant transitioned from penetrating Victim's anus to her vagina with his penis, but the evidence does not reveal that any significant break in time occurred in the sequence of events until the entire episode had ended. Nonetheless, the State argues that Defendant's touching of Victim's breasts and vagina were acts separate from the penetrations and are, therefore, not unitary with CSP. It asserts that a contrary conclusion from this Court "would prevent the [s]tate from ever convicting a defendant of multiple sex crimes from a single encounter." We disagree and explain.

**{36}** The State relies on *Sena* to argue that Defendant's contact with Victim's genitals is sufficiently discrete from the penetration that the acts are not unitary conduct. *See* 2020-NMSC-011, ¶ 56 (concluding that the conduct underlying the defendant's convictions of criminal sexual contact (CSC) and CSP were not unitary). *Sena*, however, involved a circumstance in which the defendant sexually assaulted the victim by penetrating her anus and vagina with his penis then, once finished with that act, fondled the victim's breasts and penetrated her vagina with his finger. *Id.* ¶¶ 52, 55. Our Supreme Court concluded that the conduct was not unitary principally because the crimes were separated by time and intervening events and "the battery [the defendant] used to commit the CSP was separate and distinct from the battery he used to commit CSC." *Id.* ¶ 56.

**{37}** Here, Defendant touched Victim's breasts and vagina *while* he penetrated her with his penis. Unlike in *Sena*, there was no evidence to support a temporal separation between the conduct supporting Defendant's convictions of CSP and CSCM. Indeed, at least regarding the vaginal contact, Victim testified that Defendant committed this act to help accomplish penetration. While the force used to touch Victim's breasts was not necessarily the force Defendant used to penetrate her, no evidence demonstrated that the acts were not committed at the same time and their quality and nature were directly related to Defendant's penetrative assault on Victim *Cf. id.* ¶ 46. Thus, we conclude the conduct was unitary.

**{38}** *Mora* further illustrates our conclusion. *See* 2003-NMCA-072, ¶ 18 (concluding that the conduct underlying the defendant's convictions of CSCM and attempted CSPM was unitary). In *Mora*, the defendant was convicted of CSCM for laying on top of the victim and attempted CSPM for the act of "humping" her. *Id.* ¶¶ 3, 18. On appeal, this Court held that the conduct was unitary, reasoning that the "contact and attempted penetration all took place within the same short space of time, with no physical separation between the illegal acts." *Id.* ¶ 18. The same is true in this case. Defendant touched Victim's breasts and genitals while he was penetrating her without any separation between these events. Contrary to the State's argument, if such was not unitary conduct, the State could potentially charge future defendants with numerous counts of battery for every time they touched a victim during a sexual assault. Put simply, the facts of this case reasonably support a conclusion that Defendant's conduct was unitary and there is insufficient evidence to establish the requisite indicia of distinctness. Thus, "we must conclude that the conduct was unitary." *See Phillips*, 2024-NMSC-009, ¶ 38 (internal quotation marks and citation omitted). We, therefore, conclude the conduct underlying Defendant's remaining CSCM convictions (Counts 3 and 4) was unitary with his penetrative assaults of Victim. As such, his convictions of Counts 3 and 4 must be vacated.

## III.    Convictions "In the Alternative"

**{39}** Given our analysis and conclusions thus far in this opinion, Defendant's only remaining convictions are for Count 1, the alternative to Count 1, Count 2, and the alternative to Count 2. Defendant argues, and the State agrees, that the convictions of both charges in each count violate his constitutional protections against double jeopardy. Although we are not bound by the State's concession, we agree and conclude that Defendant cannot be punished for both the primary and alternate charges alleged in Counts 1 and 2. *See, e.g.*, *State v. Comitz*, 2019-NMSC-011, ¶ 31, 443 P.3d 1130 (concluding that duplicative convictions for the same criminal acts advanced under different theories violate double jeopardy). Generally, under such circumstances the remedy is to "vacate the conviction carrying the shorter sentence." *State v. Montoya*, 2013-NMSC-020, ¶ 55, 306 P.3d 426. Here, however, all of the charges in Counts 1 and 2 allege CSPM, a second-degree felony, and the district court's imposition of other penalties, such as sex offender registration, is not clearly tied to a specific conviction. Thus, we cannot say whether the primary charge in each count or its alternate carry the lesser penalty. We must, therefore, remand the case to the district court so that it can determine which convictions to vacate. *See Porter*, 2020-NMSC-020, ¶ 42 ("Where, as here, both offenses result in the same degree of felony, the choice of which conviction to vacate lies in the sound discretion of the district court."). Defendant makes no argument that Counts 1 and 2, alleging CSP of Victim's vagina and anus, respectively, violate double jeopardy as to each other. Thus, we affirm the district court as to one conviction within each of Counts 1 and 2.

## IV.    Juror-Related Claims

**{40}** Defendant lastly advances two arguments related to jury selection and instruction that he claims amount to reversible error either individually or cumulatively. First, Defendant argues that the district court improperly granted the State's motion to strike a potential juror for cause who did not, in Defendant's view, demonstrate sufficient bias or partiality to justify granting the State's motion. Second, Defendant asserts that the district court erred in refusing to issue a curative instruction to the jury after the State made a comment that, according to Defendant, implied that his prior, consensual sex with Victim was unlawful purely because Victim was a minor at the time. Defendant urges that without the curative instruction he proffered, the jury may have been confused, thinking that "statutory rape" was a justifiable basis for convicting Defendant in this case. We address each argument in turn.

## A.      Jury Selection

**{41}** During voir dire, the prosecutor asked, "Does anyone feel that they would not be able to return a conviction if they only heard testimony alone from somebody who was sexually assaulted?" Several prospective jurors responded in the affirmative, variously indicating that they would need more than the testimony of an alleged victim to convict a defendant charged with sexual assault. One such prospective juror (Juror) who Defendant now argues was improperly struck for cause, responded by stating, "When [it's] just 'he said, she said,' it's very hard to determine the facts and I think those are very important in determining whether guilt is present." Juror then stated that she could be fair and impartial as it relates to crimes against children—a circumstance about which she had previously expressed potential bias—but her concerns about convicting a defendant based on an alleged victim's testimony alone were never revisited.

**{42}** The State later moved to strike Juror for cause, arguing that she—along with several others—stated that she "would need more than just testimony." Defendant responded to the State's motions by arguing that Jurors' statements were not "a clear enough indication" that she could not be fair and impartial and that the question itself was unclear. The district court granted the State's motion to strike Juror, finding that Juror stated she could not decide the case "based on testimony alone." Defendant argues that granting the State's motion to strike Juror was error because Juror was "a qualified juror struck without cause." We disagree and conclude Juror was properly excluded from the jury.

**{43}** "We review the trial court's rulings regarding the selection of jurors for an abuse of discretion because the trial court is in the best position to assess a juror's state of mind, based upon the juror's demeanor and credibility." *State v. Holtsoi*, 2024-NMCA-042, ¶ 5, 547 P.3d 770 (internal quotation marks and citation omitted). "An abuse of discretion exists when the [district] court acted in an obviously erroneous, arbitrary, or unwarranted manner." *Id.* (internal quotation marks and citation omitted). "The [district] court, who is listening first hand to counsel's questions and the panel members' responses, is in the best position to determine whether voir dire has sufficiently exposed any biases that may preclude jurors from acting fairly and impartially." *State v. Johnson*, 2010-NMSC-016, ¶ 34, 148 N.M. 50, 229 P.3d 523 (internal quotation marks and

citation omitted). "We will reverse only if a clear abuse of discretion by the district court in the conduct of voir dire resulted in prejudice to [the] defendant." *Id.*

**{44}** Defendant contends that in the circumstance present here—where the district court grants a state's motion to strike a potential juror who, according to Defendant, should not be stricken—prejudice is impossible to prove beyond merely pointing to the guilty verdict. Defendant, therefore, suggests that this Court adopt a standard of review similar to that which we use in cases where a potential juror's right to serve on a jury has been impaired, which does not require a showing of prejudice. *Cf. State v. Rico*, 2002-NMSC-022, ¶ 18, 132 N.M. 570, 52 P.3d 942 ("[W]e hold that each [d]efendant is entitled to a new trial because every reasonable effort to accommodate the prospective jurors' language difficulties, consistent with the provisions of Article VII, Section 3, was not made.").

**{45}** Defendant's argument, however, misconstrues the nature of the prejudice at issue in both impartial jury cases, as here, and cases involving a potential juror's right to serve, as in *Rico. See id.* In cases such as this, where a defendant alleges that his right to an impartial jury was violated, our inquiry is whether the jury selection process prejudiced the defendant or whether the jury ultimately empaneled was somehow partial. *See Johnson*, 2010-NMSC-016, ¶ 34 ("We will reverse only if a clear abuse of discretion by the district court in the conduct of voir dire resulted in prejudice to [the] defendant."); *State v. Gardner*, 2003-NMCA-107, ¶ 16, 134 N.M. 294, 76 P.3d 47 ("[The d]efendant cannot prevail on appeal unless he demonstrates that the jurors finally selected were biased or prejudiced.").

**{46}** In cases concerning a potential juror's right to serve on a jury, on the other hand, the prejudice is to the potential juror impermissibly excused, not to the defendant standing trial. *See Rico*, 2002-NMSC-022, ¶ 6 (stating that, although "individual jurors' rights . . . were violated, such a violation would not require a new trial unless we determine that [the d]efendants have standing to assert *the jurors'* rights" (emphasis added)). The harm to potential jurors in those cases is the inability to exercise a constitutional right, and a defendant making such a claim on behalf of the juror need not, and indeed cannot, prove prejudice beyond the constitutional violation. Here, Defendant suggests that similarly he cannot prove the prejudicial effect of the removal of Juror, who Defendant views was demonstrably impartial. However, as stated above, our inquiry regarding whether Defendant was deprived of his constitutional right to an impartial jury focuses on the selection process and the jury ultimately empaneled, not the excusal of potential jurors who may have been impartial. *See Gardner*, 2003-NMCA-107, ¶ 17 ("[A d]efendant has a legal right only to impartial jurors, not to the impartial jurors of his choice." (internal quotation marks and citation omitted)). Thus, we reject Defendant's argument that he need not establish that he was prejudiced by the dismissal of Juror or that we otherwise apply a different standard of review than abuse of discretion.

**{47}** The record before us indicates that the district court did not abuse its discretion in granting the State's motion to strike. The State's question was reasonably directed at

identifying jurors who would have difficulty rendering a guilty verdict based on a victim's testimony alone, which is contrary to established law. *See* NMSA 1978, § 30-9-15 (1975) (stating that "[t]he testimony of a victim need not be corroborated in prosecutions" for sex crimes). Defendant argues that such a question "primed the jury to believe Victim and culled those who were likely to be more critical." However, it is a foundational principle of voir dire that district courts and litigants may question prospective jurors about their beliefs that may potentially interfere with their ability to follow the law, such as Section 30-9-15. *See State v. Clark*, 1999-NMSC-035, ¶ 5, 128 N.M. 119, 990 P.2d 793 ("[A] juror is properly excludable for cause if the juror's views would prevent or substantially impair the performance of his or her duties as a juror in accordance with his or her instructions and his or her oath." (internal quotation marks and citation omitted)).

**{48}**     Not only was the question proper, but the district court had adequate reason to strike Juror based on her answer. Juror responded affirmatively to the State's question regarding whether she would have a difficult time convicting Defendant based on Victim's testimony alone, which is more than what the law requires. *See* § 30-9-15. Juror was never rehabilitated on this point and nothing in the record before us indicates that she unequivocally stated she could impartially follow the law. As such, the district court's decision to grant the State's motion to strike Juror was not "obviously erroneous, arbitrary, or unwarranted," and it was, therefore, not an abuse of discretion. *See Holtsoi*, 2024-NMCA-042, ¶ 5 (internal quotation marks and citation omitted).

## B.    Jury Instruction

**{49}**     Defendant next argues that the district court erred when it refused to instruct the jury that Defendant's prior, consensual sex with Victim was lawful. During trial, Victim testified that she had consensual sex with Defendant three days prior to the incident in question. Defendant admitted this during his testimony as well and the State, in closing argument, stated, "[Defendant] admitted he previously had sex with [Victim], who was a minor." Defendant objected, arguing that the statement Victim "was a minor . . . gives the implication that [Defendant] committed an . . . illegal act." Defendant then asked for a curative jury instruction because the prior sex was not illegal and expressed concern that the jury could consider the prior conduct as unlawful during deliberation. The district court denied Defendant's request, finding that the statement was an accurate reflection of Defendant's testimony and nothing prevented defense counsel from arguing the prior sex was not illegal during his closing statement. Defendant argues that the district court's decision not give a curative instruction was error. We disagree.

**{50}**     A trial court's decisions regarding statements made during closing argument are reviewed for an abuse of discretion. *See State v. Sosa*, 2009-NMSC-056, ¶ 25, 147 N.M. 351, 223 P.3d 348 ("Because trial judges are in the best position to assess the impact of any questionable comment, we afford them broad discretion in managing closing argument."). As stated above, "[w]e will find that a district court has abused its discretion when it acted in an obviously erroneous, arbitrary, or unwarranted manner." *State v. Ramos-Arenas*, 2012-NMCA-117, ¶ 16, 290 P.3d 733 (internal quotation marks

and citation omitted). Here, the prosecutor's statement accurately represented Defendant's testimony at trial and was a brief comment in a longer list of unrelated admissions made by Defendant. Defendant does not argue that the prosecutor placed further emphasis on Defendant's prior sex with Victim or otherwise implied that he had engaged in unlawful acts outside those charged. As such, we find no basis to conclude that the district court's refusal to issue a curative instruction was obviously erroneous or unwarranted. *See Sosa*, 2009-NMSC-056, ¶ 29 ("[T]he general rule is that an isolated comment made during closing argument is not sufficient to warrant reversal." (internal quotation marks and citation omitted)). We, therefore, conclude that the district court did not err in refusing to give the instruction.

## C.   Cumulative Error

{51}   Defendant argues that the above, jury-related claims amount to cumulative error requiring reversal. As we have already concluded that the district court did not commit error, we reject this argument. *See State v. Samora*, 2013-NMSC-038, ¶ 28, 307 P3d 328 ("Where there is no error to accumulate, there can be no cumulative error." (alteration, internal quotation marks, and citation omitted)).

## CONCLUSION

{52}   For the reasons set forth above, we remand to the district court to vacate Defendant's convictions for the following counts as charged in the indictment: Count 3, the alternative to Count 3, Count 4, Count 5, the alternative to Count 5, Count 6, and Count 8. We further remand to the district court to vacate, within its discretion, either the primary charge or the alternate in each of Counts 1 and 2,[5] and to resentence Defendant consistent therewith.

**{53}   IT IS SO ORDERED.**

**J. MILES HANISEE, Judge**

**WE CONCUR:**

**MEGAN P. DUFFY, Judge**

**KATHERINE A. WRAY, Judge**

---

5Because we have decided this case on the grounds discussed herein, we decline to consider Defendant's mooted arguments, including his assertion that he was unlawfully sentenced for Count 5, and that his convictions for Counts 3 and 4 violate double jeopardy as to each other rather than as to his convictions of CSP.